# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

BETH A. FAIR,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of SSA,

        Defendant.

No. C05-1046

**ORDER**

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

## I. PROCEDURAL BACKGROUND

Plaintiff Beth A. Fair applied for Title II benefits on January 16, 2003, alleging an inability to work since April 1, 1996 (Tr. 114-16). Ms. Fair simultaneously applied for Title XVI supplemental benefits as well, alleging an inability to work since February 16, 1996[1] (Tr. 527-29). Both her applications were denied (Tr. 92-95, 531-35), and denied again on reconsideration (Tr. 98-100, 537-40). A hearing before Administrative Law Judge ("ALJ") Andrew T. Palestini was held on January 7, 2005 (Tr. 55-83). In an Opinion dated March 22, 2005, the ALJ denied benefits (Tr. 24-37). On July 12, 2005, the Appeals Council granted the plaintiff's request for review (Tr. 550-53). In a Decision dated August 17, 2005, the Appeals Council modified some of the ALJ's prior findings,

---

[1]Through her attorney, Ms. Fair changed the alleged onset date of her disability to February 3, 2003 at the 2005 ALJ hearing (Tr. 58).

but again denied benefits.[2]  This action for judicial review was timely filed on September 22, 2005.

## A. Medical History

### 1. Physical Symptoms

Ms. Fair often visited physicians at the Medical Associates Clinic as an outpatient or for acute care treatment of severe headaches (particularly on the left side) and chronic sinus infections from September 1, 1995 through December 20, 2002 (Tr. 235-371).  A progress note from Dr. Laurie Garms, a neurologist, on September 25, 1995 described how the muscle contraction headaches began when Ms. Fair first learned that she was pregnant approximately five months earlier (Tr. 371).  Dr. Garms was limited in the medicines she could offer plaintiff at that time because of potential harm to the fetus, so she prescribed Tylenol with Codeine and stated that better pain management, if needed, could occur once the chid was born (Tr. 370).  By July 23, 1997, Ms. Fair reported to Dr. Daniel LaChance that she suffered persistent headaches almost daily for more than a year (Tr. 353).

According to Dr. LaChance, "[s]tress, especially psychosocial stress, are clearly precipitating factors"[3] (Tr. 353).  In April of 1998, Acute Care Center physicians confirmed that CT scans of the head/sinuses were normal (Tr. 332, 329, 323).  On October 31, 1999, Ms. Fair complained of difficulties sleeping due to headaches that

---

[2]The Appeals Council issued a correcting decision, providing that: (i) claimant's allegations are "not" credible as discussed in the prior ALJ decision; and (ii) claimant did not "in effect" withdraw a request for Title II hearing, but is not entitled to such benefits because she failed to meet special insured status requirements.

[3]Dr. LaChance proceeded to recount how Ms. Fair had been treated for depression for some time and was currently taking Zoloft (Tr. 352).  He opined that "there is little chance at success in treating Beth's headaches as long as psychosocial stressors continue to domina[te] her life" (Tr. 352).  At one point, Ms. Fair indicated that final exams were a great source of anxiety because she was on academic scholarship and needed to maintain a certain GPA (Tr. 276).

seemed to start "from the base of the skull over the neck and around the left side of the face into the left eye" (Tr. 290).   On November 8, 1999, Ms. Fair expressed to Dr. Christine Sinsky that certain medicines (i.e., Lortab, Imitrex) proved helpful (Tr. 287), but over the years trials of multiple medications (both over-the-counter and prescription) failed to provide sustained relief (Tr. 345, 342, 340, 338, 327, 295, 253). Dr. Garms began to see Ms. Fair again in 2000 after discharging plaintiff from the neurology department[4] in 1997 pursuant to certain incidents of drug seeking behavior for narcotics like hydrocodone (Tr. 265, 274, 276, 283, 284).   On June 5, 2000, Dr. Garms classified Ms. Fair's persistent headaches as "rare if ever disabling" (Tr. 264).

## 2.  Mental Symptoms

Ms. Fair also sought outpatient treatment from October 17, 1995 through June 16, 2003 at the Gannon Mental Health Center for symptoms of depression and anxiety (Tr. 471-392).   Ms. Fair cited several life stressors as contributing to her mental limitations over time: (1) domestic problems with her boyfriend and father of her child; (2) the terminal illness and subsequent death of her father; (3) a strained relationship with her siblings and mother; (4) alcohol and drug dependency; (5) financial hardship; and (6) tiredness as a side effect of her many prescribed medications (Tr. 465-63, 442-438, 396).   Multiple treating sources (i.e., psychiatrists, licensed psychologists, licensed social workers, and licensed mental health counselors) had the opportunity to assess Ms. Fair during her time at the Gannon Center.   Jan Callahan, L.S.W., provided extensive one-on-one therapy[5] with Ms. Fair for years while Dennis Grant, also a licensed mental health counselor, was responsible for ongoing treatment since 2002.

---

[4]Dr. Garms recounted how Ms. Fair was told upon her prior dismissal from Neurology that "there was not anything further we had to offer" (Tr. 265).

[5]Ms. Callahan ended each session progress note with a GAF score that ranged from 65 to 45 depending on the degree of anxiety and depression displayed at the time (Tr. 456, 443, 449, 435-34).   At times, the GAF score fluctuated five points within a manner of weeks (Tr. 438-37).

Dr. Thomas C. Piekenbrock, psychiatrist and medical director of the Gannon Center, dealt with Ms. Fair for medical review and pharmacological management (Tr. 430-418). Dr. Piekenbrock treated Ms. Fair on a six month basis for medications and on January 16, 2003, noted that the patient felt herself to be "doing well" while on a combination of medications that she described to be "the best she ha[d] been on and that would include perhaps ten other anti-depressants over a period of the last ten years" (Tr. 402). Dr. Piekenbrock reported that Ms. Fair exhibited no physical/emotional problems, no symptoms of side effects/abuse, and appeared "stable" according to Mr. Grant's progress notes at that time (Tr. 402). Dr. Piekenbrock diagnosed Ms. Fair with (1) Adjustment Reaction with mixed emotional features; (2) Borderline Personality Trait Disorder; and (3) History of PTSD (Tr. 402). He prescribed Prozac and Xanax, urged continued talk therapy with Mr. Grant, and set another appointment to manage medicines in six months (Tr. 402).

Psychiatrists Kishore Thampy and Thomas Campbell also saw Ms. Fair for brief treatment in 1996 and 1998, respectively, and noted how Ms. Fair went through various anti-depressant trials in the past because of side effects (i.e., fatigue, stomach upset, constipation, etc.) (Tr. 453-459, 457, 455-451, 431). The progress notes from various treating sources indicate that Ms. Fair constantly battled personal difficulties with: staying motivated, focused, over-eating, taking steps to become socially engaged, and keeping up energy (Tr. 470, 456, 445, 436, 421, 417, 396). However, the several treating sources determined that Ms. Fair did not appear homicidal or otherwise a threat to herself or others (Tr. 456, 407, 397).

On February 3, 2003, Mr. Grant sent a letter[6] to disability examiner Heather Sweet regarding the status of Ms. Fair's mental condition (Tr. 399-401). Mr. Grant diagnosed

---

[6] It is important to note that this letter was countersigned by Dr. Keraus, a licensed psychologist (Ph.D.) and Clinical Director of the Gannon Center, who did not specifically treat Ms. Fair himself.

Ms. Fair with Major Depressive Disorder, Borderline Personality Disorder, and Post Traumatic Stress Disorder ("PTSD") and gave her a GAF score of 45 (Tr. 399). He stated that Ms. Fair could readily perform all self-care activities and appeared "fully capable of caring for her son regarding his academic, social, physical, and psychological needs" (Tr. 400). Regarding the effects of her mental conditions on Ms. Fair's potential for work, he opined that "her interaction with others, her overly sensitive demeanor with others, her tendency to be depressed, discouraged, and pessimistic tends to render her with marked or severe impairments in terms of these vocational functions" (Tr. 400). Mr. Grant proposed these treatment goals: "to help her get to a more suitable residence, to help get her on disability or full-time employment, to help stabilize her mood" (Tr. 399).

During a counseling session with Ms. Fair two months later in March of 2003, Mr. Grant noted that she had moved into a new apartment that she liked much better and that her respiratory/allergy symptoms had gone down (Tr. 398). Despite feeling distant from her mother, Ms. Fair reported experiencing "some positive encounters with family members"[7] (Tr. 398). Mr. Grant gave Ms. Fair a GAF score of 45, but urged her to seek part-time employment and volunteer work through a school or daycare and continue to maintain open lines of communication with family members as part of a treatment plan (Tr. 398).

On June 10, 2003, Mr. Grant sent a follow-up letter to disability examiner Ann Davis regarding plaintiff's mental status (Tr. 393-95). He determined that Ms. Fair would likely "have at least marked or severe impairment in terms of remembering and understanding procedures, instructions, and locations and maintaining an appropriate

---

[7]On May 2, 2003, Mr. Grant noted that Ms. Fair reported a "better relationship" with her siblings and recognized how the use of her son as a pawn when dealing with her mother was not advisable (Tr. 397).

amount of concentration and attention and pace" (Tr. 394). Furthermore, he found as follows:

> . . . her interaction with supervisors, co-workers and the public would probably [be] at least markedly impaired due to her sensitivity and her Borderline traits as well as her anxiety and depression. She generally would use good judgment and respond appropriately if the situation were of a benign nature in the workplace. However, if she was faced with stressors and pressure and tension within the work place, I believe that she would have at least a marked impairment in terms of her appropriate responses. . . . I do not think that she is impaired to the point of not being able to find and sustain work on more than a part-time basis . . .

(Tr. 394-95).

Treating mental health workers reported over multiple progress notes that Ms. Fair failed to follow certain prescribed treatment regimens, proceeded to self-medicate, and/or exhibited prescription drug seeking behavior at times (Tr. 458-57, 453-52, 450, 448-47, 442). Earlier in her treatment, Ms. Fair experimented with and/or abused both alcohol and drugs (454, 442-40). Different treating sources advised Ms. Fair to participate in outpatient substance abuse programs, Borderline Personality Skilled Training Groups, or engage in other kinds of social interaction (i.e., establishing an informal support group for mothers) (Tr. 439-38). Although the medical record does not confirm the extent to which Ms. Fair pursued these suggestions, Ms. Fair admitted that "she has difficulty following through with the steps on her own" (Tr. 437). In 2003, Ms. Fair reported on more than one occasion that she desired to become involved in some type of work situation as evidenced by her continued meeting with the Promise Jobs organization, etc. (Tr. 396-98).

Mr. Grant noted on April 25, 2002, that "Beth has very negative memories of her mother and father being physically and emotionally abused," lending credence to a diagnosis of PTSD history (Tr. 416). However, earlier she denied any parental abuse during her intake/diagnostic interview with the Gannon Center in 1995 (Tr. 472-71). In a short string of progress notes covering July through November of 2003, Mr. Grant

charted Ms. Fair's symptoms (Tr. 509-02). On July 14, 2003, Mr. Grant spent much of his report detailing the extent of Ms. Fair's difficulties with headaches (Tr. 509). Ms. Fair's headaches seemed to be occurring almost daily and were beginning to "impair[] her from social, cognitive, and physical activities" (Tr. 509). Although Mr. Grant suggested that allergy symptoms may be compounding the headache issue, Ms. Fair refused to sign a release of information between the two specialist types (Tr. 509). During that same appointment, Ms. Fair reported tension with her mother, but improved relations with her sister (Tr. 509).

Ms. Fair's mother, Linda also attended several therapy sessions in an attempt to improve their domestic relationship (Tr. 506). Both women appeared very upset at times and cried throughout the process of working through mother-daughter issues, but neither presented as psychotic or delusional (Tr. 506, 503-02). At one joint session with Mr. Grant in November of 2003, a discussion of Ms. Fair's recent arrest for which her mother paid bail made Ms. Fair so agitated that she stormed out, exclaiming that she would not return (Tr. 502). At times, Ms. Fair and her mother admitted during therapy that their relationship was improving and Mr. Grant encouraged Ms. Fair to continue with her medications, current living standards, and involvement with her son in both the Boy Scouts and a reading club (Tr. 503).

The last progress note from Dr. Piekenbrock included in the medical records is dated December 7, 2004 (Tr. 518). Dr. Piekenbrock noted that he had seen Ms. Fair on a three-to-four month basis for medications while Mr. Grant continued individual therapy (Tr. 518). Despite Ms. Fair's claims that she is adjusting well to prescribed medications, she still complains of anxiety signs/symptoms (Tr. 518). Effexor, Xanax, and increasing dosages of Neurontin were provided as a result (Tr. 518). Ms. Fair continued to request pain medication for headaches that persist and will try to go back to Neurology for further assessment (Tr. 518).

## B. Plaintiff's Subjective Allegations

On August 23, 2000, Ms. Fair completed a Personal Pain/Fatigue Questionnaire in which she described suffering from a sharp pain on the left side of her head and neck[8] (Tr. 148). The pain lasts 5-6 days per week and is worse with "movement, light and loud sounds" (Tr. 148). Ms. Fair claims that the pain lasts all day long unless prescribed medications work (Tr. 148). She further claims that her pain worsened over the past year and describes two of her five prescription medications[9] as largely ineffective (i.e., Neurontin and Atarax). Alternative treatment therapies (i.e., ice packs, massages, baths) have not helped much (Tr. 149). The constant pain makes it difficult to talk and restrict Ms. Fair's activities in that she no longer reads, exercises, or engages in social interaction (Tr. 149). The medications have caused excessive sleep and lethargy resulting in a dramatic increase in body weight over time (i.e., from 150 to 250 lbs.) (Tr. 150). Ms. Fair claims that her pain does not prevent her from performing self-care needs or the use of her extremities, but states that it is painful to walk when her head throbs (Tr. 151).

On February 3, 2003, Ms. Fair completed a Migraine Headache Questionnaire in which she described episodes as occurring at least three times a week (Tr. 176). The pain concentrates on the left side of her face and neck and seems to last between 3-5 hours, depending on the medication used (Tr. 176). Due to light and sound sensitivity, these episodes often require that Ms. Fair seek out a dark room for quiet and rest (Tr. 176). Although medications seem to work over time, they are not curative and occasionally she must seek immediate medical attention (Tr. 177).

On February 3, 2003, Ms. Fair completed a Daily Activities Questionnaire (Tr. 176-81). She lives in an apartment with her son and regularly performs all self-care

---

[8] The pain stems from migraines that often occur at night and make the face and neck tight in the morning (Tr. 160).

[9] She also takes Paxil, Imitrex, and Lorazepam, which do provide moderate relief, but reported that her current medications have a side effect of drowsiness (Tr. 149).

needs in addition to most household chores (Tr. 178). Ms. Fair describes her sleep patterns as erratic, either sleeping entirely too much or being restless at night (Tr. 178). She prepares all of her own meals and shops for groceries twice monthly (Tr. 179). Although she has a valid driver's license and drives three times per week, Ms. Fair claims to require assistance with public transportation (Tr. 179). Ms. Fair does care for her son and a pet cat, providing food and making sure that the house is clean (Tr. 179). She claims that a side effect of her medications is headaches which tends to exacerbate her existing migraine condition (Tr. 179). She follows soap operas and understands/remembers what she hears and reads but no longer reads for fun (Tr. 180). Ms. Fair only meets with friends once a week when her son stays with his grandparent, but generally avoids going out in public due to a lack of motivation and fear of dealing with people (Tr. 180). Ms. Fair claims not to get socially involved and expresses major difficulties getting along with others (Tr. 180). She does not respond well to criticism, even if constructive, and has dealt poorly with past work supervisors (Tr. 180). Ms. Fair has great trouble concentrating, remembering, weathering change, and reacting to stress (Tr. 181). However, she cites no difficulties following directions, paying bills, or managing funds (Tr. 181).

On February 5, 2003, plaintiff's mother, Ms. Linda Chapman, completed a Third Party Daily Activities Questionnaire (Tr. 182-85). Ms. Chapman states that Ms. Fair does take care of her son, but receives some help from two sets of grandparents (Tr. 183). Ms. Chapman claims that her daughter rarely gets socially involved and may become angry, defensive, or extremely upset to the point of tears when criticized or under stress (Tr. 184-85). She admits her daughter's mood is erratic, shifting between sadness and anger (Tr. 185).

## C. Hearing Testimony

Ms. Fair was thirty-nine years of age at the time of the hearing and completed enough college courses to obtain a degree,[10] but has not yet done so (Tr. 59). Ms. Fair testified that Dennis Grant and Dr. Piekenbrock of the Gannon Center have treated her mental illnesses over the course of several years (Tr. 60). She listed her current medications (i.e., Xanax, Neurontin, and Effexor) and reported grogginess and excessive sleep as side effects (Tr. 61, 65). She further claimed that she used to take Imitrex on-and-off, but currently takes no medicines for migraines[11] (Tr. 61). She testified that she has not been gainfully employed since 1996, but past jobs include: proofreader, factory worker, day care provider and customer order clerk (Tr. at 72, 77). She stated that her daily life is severely affected by several symptoms secondary to her mental illness, including but not limited to difficulties with (1) social interaction;[12] (2) leaving the house; (3) sleeping too much [i.e., often 12-15 hours per day]; (4) concentrating;(5) procrastination; and (6) self-control around food[13] (Tr. 62, 64, 66, 68).

---

[10]She testified that she attended various institutions over nine years, due in part to absenteeism and financial concerns, but continues to procrastinate in getting an undergraduate degree (Tr. 63).

[11]However, Ms. Fair did report that she received emergency medical care for a migraine just the week before the hearing at which time a physician administered an injection to "take away the cycle of headaches" (Tr. 61).

[12]For example, Ms. Fair explained that she had past conflicts with students, teachers, friends, and employees (Tr. 63-64, 70, 75). One such conflict with a co-employee when working as a customer service representative resulted in a three day suspension (Tr. 64). A later incident involving a neighbor's broken window resulted in Ms. Fair's arrest (Tr. 502).

[13]Ms. Fair testified to having gained between 50 to 80 pounds before taking anti-depressants and other prescription medicines (Tr. 68). At the hearing, she was 5'5" and 220 lbs. (Tr. 69).

Ms. Fair admitted to experimenting with certain illicit substances in the past (i.e., marijuana, methamphetamines) (Tr. 59-60). She stated that she performs general self-care needs without assistance[14] (Tr. 66). Ms. Fair claimed to leave her home to run errands around four times a month, but testified that driving while on Neurontin affects her vision (Tr. 69). Ms. Fair testified that her difficulties concentrating also preclude her from adequately performing work with things as opposed to people (Tr. 71). Despite encouragement from Mr. Grant to join a support group, Ms. Fair has been afraid to do so given her "hard time getting out" of the house (Tr. 72). Ms. Fair attributed her inability to maintain any employment or complete her degree directly to symptoms associated with her mental illnesses (Tr. 73).

### D. Competing RFC's

On October 10, 2000, Dr. Herbert Notch, a psychologist, examined Ms. Fair's case file as a DDS consultant (Tr. 226). Dr. Notch determined that Ms. Fair suffers from Adjustment Disorder and Personality Disorder, but that these mental conditions do "not meet or equal a listed impairment" (Tr. 226). Dr. Notch based his determination on evidence that Ms. Fair has been followed for depression and headaches both of which have been responsive to medications (i.e., Celebrex, Cataflam, and Paxil) (Tr. 226). Dr. Notch accorded the treating source controlling weight and further opined that Ms. Fair seems to have "no significant ADL restrictions" that would interfere with simple work activities (Tr. 226).

On October 17, 2000, DDS physician consultant Dr. Robert Knox completed a RFC examination (Tr. 227-33), noting that Ms. Fair should not lift more than 20 pounds occasionally or 10 pounds frequently (Tr. 228). Dr. Knox recognized Ms. Fair's migraines, depression, and anxiety to be severe impairments, but concluded that such limitations fail to meet the listed impairment status (Tr. 233). In support of his

---

[14]Ms. Fair testified that she does household chores and will leave the house to grocery shop when she "knows that [she] do[esn't] have a choice but to do them" (Tr. 67).

determination, Dr. Knox recounted evidence of Ms. Fair's positive response to medications and ability to perform self-care needs in addition to caring for others (i.e. her son and pet) (Tr. 233).

On March 18, 2003, Dr. Phillip Laughlin, Ph.D., reviewed Ms. Fair's file as a consultant examiner for the DDS (Tr. 372-91). Dr. Laughlin determined that plaintiff's "restrictions are no more than moderate" and despite the severity of symptoms, that Ms. Fair "does not meet or equal Listing Impairment" (Tr. 386). Dr. Laughlin described Ms. Fair's limitations as follows:

> . . . manifest moderate restrictions of function with social interaction, sustained pace, concentration and attention, and adaptation/executive function. There have not been significant episodes of deterioration that cause the claimant to withdraw or experience exacerbation of signs and symptoms that include deterioration of adaptive behaviors related to psychological factors.

(Tr. 387).

On July 23, 2003, Dr. David Beeman, Ph.D., also reviewed Ms. Fair's complete file as a psychological consultant for the DDS (Tr. 482-86). Dr. Beeman concurred with the previous findings of Drs. Laughlin and Notch and determined that record evidence does not show a worsening of condition as alleged by Ms. Fair (Tr. 486). Dr. Beeman indicated that "treating source records, in fact, reflect an improvement in mental status" (Tr. 486). Dr. Beeman opined that Ms. Fair suffers from moderate restrictions in social functioning, concentration, persistence, and pace with mild limitations in ADLs (Tr. 486). Despite moderate limitations in completing a normal workday or workweek,[15] Dr. Beeman concluded that the "claimant retains the ability to complete simple, routine, and repetitive work functions, as well as some at the moderate level, when motivated to do so as long as

---

[15]Such restrictions affect attendance, the ability to adapt to changes in the work environment or keep up pace without psychological interruptions, and appropriate social interaction (Tr. 486).

not unduly stressed or socially demanding" (Tr. 486). In line with the other DDS consultants, Dr. Beeman noted that Ms. Fair's conditions, although severe, fail to meet or equal listing level severity (Tr. 486).

Dr. J.D. Wilson reviewed Ms. Fair's records concerning physical limitations (i.e., headaches) as a DDS consultant on July 28, 2003 (Tr. 487-501). Dr. Wilson noted that Ms. Fair performs all self-care needs, household chores, looks after her child, shops without assistance, and often drives an automobile (Tr. 501). Dr. Wilson concluded that "claimant's physical condition, while a medically determinable impairment, would be deemed non-severe" (Tr. 501).

Mr. Grant completed a Mental Impairment Questionnaire for Ms. Fair on July 26, 2004 (Tr. 510-16). Mr. Grant indicated that Ms. Fair seems to have done well in her separate pharmacological visits to Dr. Piekenbrock, but that Ms. Fair has not responded well to in-person family counseling (Tr. 510). Mr. Grant noted the side effects of Ms. Fair's current medications (i.e., dizziness, fatigue, headache) and described how Ms. Fair suffers from mood swings, anhedonia, anger problems, and low self-esteem (Tr. 510). Mr. Grant completed an exhaustive checklist in making his RFC determination (Tr. 513). In six[16] out of twenty-five possible categories, he considered Ms. Fair to be "seriously limited, but not precluded" from performing unskilled work (Tr. 513). In one category Ms. Fair is deemed "unable to meet competitive standards" (i.e., completing a normal weekday or workweek without interruptions from psychologically based symptoms) (Tr. 514). Mr. Grant further explained that Ms. Fair would display some minor problems in executing instructions, but more visible difficulties coping with work-related stress and/or relationships on the job due to her "PTSD, MDD, and Borderline tendencies"

---

[16]These categories included: (i) sustaining ordinary work routine without special supervision; (ii) working with others or near them without being overly distracted; (iii) accepting instructions and responding appropriately to criticism; (iv) getting along with colleagues without behavioral episodes; (v) responding appropriately to work setting changes; and (vi) dealing with stress appropriately at work (Tr. 513).

(Tr. 514). Ultimately, Mr. Grant determined that Ms. Fair suffers a marked impairment in social functioning that may well lead to at least four absences per month in a work setting (Tr. 515-16).

On January 6, 2005, Dr. Piekenbrock sent a brief letter to Mr. Michael DePree, Esq., reporting that he reviewed Mr. Grant's questionnaire, completely agrees with the substance of that document, and re-inforces both Mr. Grant's opinion and diagnosis of Ms. Fair (Tr. 517).

### III.  CONCLUSIONS OF LAW

#### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole.  See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).  Substantial evidence is more than a mere scintilla.  It means relevant evidence a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986).  The court must take into account evidence that fairly detracts from the ALJ's findings.  Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987).  Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).  The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence.  Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

#### B.  ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation.  See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)    If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)    If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe.  If the impairment is not severe, benefits are denied.

(3)    If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity.   If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)    If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past.   If the claimant is able to perform her previous work, she is not disabled.

(5)    If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990).  (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

    "To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work."  Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)).  If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that

are consistent with the claimant's impairments and vocational factors such as age, education and work experience.  Id.

Under the first step of the analysis, the ALJ found that Ms. Fair had not engaged in substantial gainful activity  since her amended alleged onset date (Tr. 25).  At the second step, the ALJ determined that the combination of Ms. Fair's impairments constitutes severe impairments (Tr. 25).  At the third step, the ALJ determined that Ms. Fair's impairments did not meet or equal one of the listed impairments (Tr. 31).  At the fourth and fifth  steps, the ALJ determined that Ms. Fair has the residual functional capacity to perform past relevant work as well as other low-skilled work available in the national economy and therefore was not disabled (Tr. 35).

## C.  Treating Sources

Ms. Fair argues that the ALJ improperly discounted the opinions of her treating sources, particularly Dr. Piekenbrock and Mr. Grant, which are consistent with Ms. Fair's subjective allegations of pain.  Ms. Fair contends that her treating source opinions form part of a larger record that fully supports the notion that Ms. Fair is not capable of competitive employment.  The Commissioner argues that the ALJ offered valid, legally sufficient reasons for his treatment of the relevant opinions, i.e., that they were inconsistent and unfounded in the context of the record as a whole.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.  A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted).  The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician.  See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari,

270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

The ALJ recognized that both Mr. Grant and Dr. Piekenbrock had a history of treating Ms. Fair at the Gannon Center over a period of several years. Mr. Grant provided individual therapy as a counselor while Dr. Piekenbrock helped manage Ms. Fair's medicines every six months or so. The ALJ considered the evidence before him and enumerated the many reasons why he afforded respective opinions less than controlling weight in this matter. Mr. Grant seems to indicate in his two opinion letters that Ms. Fair's impairments are more severe than evidenced by a thorough review of his collective progress notes. Mr. Grant opines that Ms. Fair is incapable of competitive employment, but urged her to seek part-time employment, do volunteer work, and/or follow through with prospective job opportunities using services like Promise Jobs. Such suggestions are not in line with psychological symptoms that preclude any type of consistent work activity. As the ALJ correctly points out, the contemplation and active seeking of employment, by nature, contradicts a claim of total disability. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994).

On the whole, the record was fraught with further inconsistencies. Although the extent of Ms. Fair's involvement in her son's extracurricular activities (i.e. Boy Scouts, reading club, etc.) is not qualified in the record, she does take care of all of her son's living needs in addition to her own. Her alleged symptoms are not such that she cannot perform all household chores and manage her child's welfare without assistance. Mr. Grant also described Ms. Fair as markedly impaired in her social functioning. Yet, on several occasions, Ms. Fair herself indicated that her relationship with siblings improved and during some of the joint therapy sessions with her mother, Ms. Fair noted some progress. Finally, the ALJ was correct in not relying on Mr. Grant's assertion that

Ms. Fair would likely miss four days per month if slated to work as a competitive employee. Although medical opinions on the specific amount or hours of work a claimant can do are permitted and encouraged, treating sources cannot opine as to whether a claimant can be gainfully employed. <u>Smallwood v. Charter</u>, 65 F.3d 87, 89 (8th Cir. 1995). Such conclusions are intended for the vocational expert as they exist "outside the medical province." <u>Id.</u>; <u>See also</u> <u>Nelson v. Sullivan</u>, 946 F.2d 1314, 1316 (8th Cir. 1991) (noting that physician statements concerning a claimant's potential for gainful employment do not constitute medical opinions, but opinions on the Social Security Act's application).

Dr. Piekenbrock described Ms. Fair during a January 2003 session as a "disabled, unemployed, white female currently being seen for diagnosis of History of PTSD, Major Depressive Disorder, Borderline Personality Trait Disorder," but did not name Major Depressive Disorder in the diagnosis portion of his report (Tr. 402). It is important that Dr. Piekenbrock chose to diagnose claimant instead with "Adjustment Reaction with mixed emotional features," thereby indicating a less severe mental condition (Tr. 402). Given the psychiatrist's greater medical training in accordance with 20 C.F.R. 404.1513(a), the ALJ properly weighted it over Mr. Grant's major depression claim. Ms. Fair points to a later assessment dated December 7, 2004, as evidence that Dr. Piekenbrock did, in fact, ultimately diagnose Ms. Fair as suffering from Major Depression. However, Ms. Fair misinterprets the available information. In the clinical diagnosis portion of that report, Dr. Piekenbrock noted that Ms. Fair's condition was "unchanged" from his previous diagnosis of record listed above.

Ms. Fair also argues that the ALJ mistakenly relied on an isolated session with Dr. Piekenbrock on January 16, 2003 to show that her condition was stable. During the session, Ms. Fair apparently exhibited no physical or emotional problems and felt that her current medications worked better than any combination from prior years. However, that particular session was not the only evidence that medicines did help to alleviate Ms. Fair's symptoms to some degree (<u>see</u> Tr. 255, 248, 252). The Eighth Circuit Court of Appeals

has determined that "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." Roth v. Shalala, 45 F.3d 279, 282 (8th. Cir 1995) (quoting Stout v. Shalala, 988 F.2d 853, 855 (8th. Cir 1993)).

Ms. Fair argues that Dr. Piekenbrock's January 2005 letter, in reinforcing Mr. Grant's mental health questionnaire, should stand as Dr. Piekenbrock's final word on the matter. However, in that brief letter of a single paragraph, Dr. Piekenbrock offered a conclusory statement without support to refute the inconsistencies in Mr. Grant's overall medical assessment mentioned above. It is well settled that a treating physician's opinion does not deserve controlling weight when it is a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

All of the DDS consultants who reviewed the available medical records (i.e., Dr. Notch, Dr. Knox, Dr. Laughlin, Dr. Wilson, and Dr. Beeman) concluded that Ms. Fair's collective limitations, though severe, did not rise to the listing level in accordance with the Act. The ALJ has the right to consider the opinions of these state agency medical consultants because they are not just physicians, but also experts in the field of Social Security law. See 20 C.F.R. § 404.1527(f)(2). Furthermore, the Appeals Council confirmed that Ms. Fair last met the special insured status requirements of the Act for Title II benefits on March 31, 2000 (Tr. 125-26), three years prior to her alleged disability onset date of March 31, 2000. The Eighth Circuit has made it clear that "[w]hen an individual is no longer insured for Title II disability purposes, we will only consider an individual's medical condition as of the date she was last insured." Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (citing Bastian v. Schwiker, 712 F.2d 1278, 1280 (8th Cir. 1983)).

The ALJ bolstered his refusal to afford controlling weight to certain treating source opinions through a fair attack on the credibility of Ms. Fair's subjective complaints. When

evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. at 1321-22.

However, subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Where an ALJ seriously considers, but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). In evaluating Ms. Fair's credibility, the ALJ fulfilled his obligation to make express credibility determinations and to set forth the inconsistencies in the record which caused him to reject the subjective complaints. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th. Cir. 2004). The ALJ need only acknowledge and consider the Polaski factors before discounting a claimant's subjective complaints. Id. Additionally, an ALJ is permitted to factor in the claimant's demeanor upon personal observation as part of complete credibility assessment. See Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

The court finds ample inconsistencies in the record as a whole to support the ALJ's credibility determination. Ms. Fair's recited daily activities tend to contradict the presence of any disabling mental limitation. She maintained her household and took care of all living needs for herself, her son, and her pet. Such tasks range from the preparation of daily meals to grocery shopping and the visitation of friends outside the home. Ms. Fair

maintained more than an aloof interest in her son's activities, but was involved with all facets of his daily life (i.e., from basic necessities to the Boy Scouts).

Ms. Fair herself made a series of conflicting statements. Ms. Fair reported no side effects to Dr. Piekenbrock on the same day she applied for Social Security benefits in 2003, but later testified at the hearing that she experiences serious side effects from the same medications. The ALJ did not report any visible signs of mental impairment at the that time. Plaintiff argues that the ALJ unfairly relied on past criminal incidents (i.e. misdemeanor theft, driving with open container of alcohol, etc.) to erode Ms. Fair's credibility given that Exhibit 8D containing such information was later added as a supplemental transcript to the record. This court disagrees. Prior criminal acts may be used to assess credibility, see Simmons v. Massanari, 264 F.3d 751, 756 (8th Cir. 2001), but in this case there existed other substantial record evidence sufficient to question the validity of Ms. Fair's subjective allegations.

### D. Improper Hypothetical Question

An improper hypothetical cannot serve as substantial evidence. Whitmore v. Bowen, 785 F.2d 262, 263-64 (8th Cir. 1986). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform. Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996). However, the question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ as untrue. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997). "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("These assessments alone [of non-treating physicians] cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician." Id. (citing Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991)); Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998) ("If a hypothetical question does not include all of the claimant's impairments, limitations, and

restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.").

As set forth above, the ALJ's hypothetical question properly included only those impairments which were supported by substantial evidence. The ALJ is not required to reiterate the several record inconsistencies that resulted in a determination of reduced credibility concerning Ms. Fair's subjective complaints or certain treating source opinions. The ALJ was not required to mention the substance of the Third Party Questionnaire completed by Ms. Fair's mother because such parental assertions corroborating subjective allegations that have already been properly discredited serve as mere cumulative testimony. See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998).

Ms. Fair argues that the ALJ's failure to mention Ms. Fair's low GAF scores in the RFC itself or the line of questioning posed to the vocational expert constitutes judicial error. Mr. Grant often met with Ms. Fair on a weekly basis for therapy and at the bottom of each progress note assigned a GAF score. Ms. Fair relies on the GAF score of 45 provided in both of Mr. Grant's 2003 opinion letters to demonstrate that she was in no condition to find competitive employment. See Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (noting that a GAF score of 50 or below marks a severe impairment affecting basic skills that would likely preclude employment). Yet, within one month of issuing the first opinion letter, Mr. Grant suggested that Ms. Fair pursue at least part-time employment and volunteer work through a school or day care (Tr. 398). This type of encouragement to seek employment does not reconcile with a debilitating GAF score of 45.

Either way, while a GAF score may help the ALJ to formulate an RFC, "it is not essential to the RFC's accuracy." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002). In fact, according to the Social Security regulations, the GAF scale, "used in the multiaxial evaluation system endorsed by the American Psychiatric Association . . . does not have a direct correlation to the severity requirements in [the]

mental disorder listings." 65 Fed. Reg. 50746-01, (Aug. 21, 2000) (to be codified at 20 C.F.R. pts. 404, 416) 50764 2000 WL 1173632.

Furthermore, a proper hypothetical question serves as substantial evidence when it "capture[s] the concrete consequences of a claimant's deficiencies" which the ALJ accepts as true. Pickney v. Chater, 96 F.3d 294, 297 (8th. Cir. 1997). The ALJ explicitly states the mental conditions that cause deficiencies and incorporates the resultant practical ramifications here. The ALJ "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." Roe v. Chater, 92 F.3d 672, 676 (8th. Cir. 1996) (noting that a vocational expert's hypothetical that employs terms like "occasional supervision" can capture the concrete consequences of larger "deficiencies of concentration, persistence, and pace"). This court finds that the hypothetical question posed to the vocational expert was proper in form as it included the practical consequences of those mental limitations that the ALJ accepted as true.

Ms. Fair argues that the testimony of vocational expert Julie Svec cannot constitute substantial evidence regarding plaintiff's employment potential because step 4 of the sequential evaluation process requires the availability of full-time job opportunities. Ms. Fair further contends that Ms. Fair could not perform past relevant work providing day care or working as a customer order clerk in light of Dictionary of Occupation Titles ("DOT") standards. Plaintiff urges remand on these related issues. The Commissioner argues that the ALJ offered sufficiently available full-time work in the national economy even if Ms. Fair could not return to her past relevant work.

It is true that the ALJ's RFC limitations are inconsistent with the customer order clerk requirements under DOT, but, without more, that is not enough to constitute reversible error. A claimant is not entitled benefits in such a scenario if the vocational expert further "opined that, with even greater limitations, a significant number of jobs would be available" in other semi- or un-skilled areas. Clay v. Barnhart, 417 F.3d 922, 931 (8th Cir. 2005). The customer order clerk and past relevant work posts were not the

sole positions the vocational expert found that Ms. Fair could perform. Ms. Svec identified both open skilled and unskilled jobs that Ms. Fair could still perform even if past relevant work did not prove feasible. With regard to skilled positions, Ms. Svec noted that there were 250,000 gate guard jobs, 400,000 shipping checker jobs, and 30,000 central supply worker jobs. Ms. Svec went on to note that there were 18,000 parking lot attendant positions and 250,000 tagger positions available. It is true that the ALJ did not develop the record so as to provide a specific breakdown of full-time versus part-time options within the listed positions, but Ms. Svec indicated that the central supply worker post was generally considered to be full-time while the other posts could be either full- or part-time. Clearly, the different positions existed in significant numbers in the national economy.

### E. RFC Assessment

Plaintiff argues that the ALJ failed to accurately describe limitations or consider the combined effects of alleged impairments in making the RFC. See 20 C.F.R. § 404.1523. The Commissioner argues that the ALJ more than adequately explained why the collective impairments do not prevent Ms. Fair from working, be it past relevant work or otherwise.

The ALJ thoroughly reviewed Ms. Fair's alleged physical impairment (i.e., migraine headaches) and mental impairments (i.e., Adjustment Disorder with mixed emotional features and Borderline Personality Trait Disorder). In light of the record evidence on the whole and the credibility determination discussed above, the ALJ determined that Ms. Fair could not perform work that involved: more than short, superficial interaction with others; strict deadlines; a fast mental pace; emergency situations; or handling complaints or detailed information/data.

Although the ALJ must consider medical source opinions in creating an RFC assessment, the ultimate RFC determination rests with the Commissioner. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). After reviewing Ms. Fair's alleged physical and mental impairments, subjective allegations of pain, and daily activities, the ALJ found that Ms. Fair can still perform past relevant work as a child care provider or customer

order clerk.  "'To require a more elaborate articulation of the ALJ's thought processes [in an RFC] would not be reasonable.'"  <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992) (quoting <u>Gooch v. Secretary of H.H.S.</u>, 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)).  The ALJ did not fail to consider plaintiff's alleged impairments in combination.

The ALJ did not end the inquiry with past relevant work and, with the advice of a vocational expert, found that even in the event that Ms. Fair could not return to such activities, other feasible employment opportunities were available in the national economy. Available skilled jobs included gate guard, shipping checker, and central supply worker. Available unskilled jobs included parking lot attendant and tagger.  The ALJ employed proper techniques in arriving at a fair and thorough RFC determination in this matter.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is affirmed and this matter is dismissed.

August 4, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT